Benjamin Heikali (SBN 307466)
E-mail: bheikali@faruqilaw.com
Joshua Nassir (SBN 318344)
E-mail: jnassir@faruqilaw.com
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885

*Attorneys for Plaintiff Marleny Olivo*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLENY OLIVO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE COCA-COLA COMPANY, and FAIRLIFE, LLC,<br><br>Defendants. | Case No.: 2:19-cv-08302<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **Violation of California Consumer Legal Remedies Act**<br>2. **Violation of California Unfair Competition Law**<br>3. **Violation of California False Advertising Law**<br>4. **Breach of Express Warranty**<br>5. **Breach of Implied Warranty**<br>6. **Common Law Fraud**<br>7. **Negligent Misrepresentation**<br>8. **Unjust Enrichment**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Marleny Olivo ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), brings this class action complaint against Defendants The Coca-Cola Company and Fairlife, LLC (collectively, "Fairlife" or "Defendants"). Plaintiff makes the following allegations upon personal knowledge as to her own acts, and upon information and belief and the investigation of her attorneys as to all other matters, and alleges as follows:

## NATURE OF THE ACTION

1.     Defendants produce, market, and sell a brand of milk products under the "Fairlife" label that are marketed as premium products (the "Products").

2.     Starting most egregiously with the name of Defendants' Products, "Fairlife," and throughout the labeling and marketing of Defendants' Products, the pervasive marketing scheme promises to reasonable consumers that the animals involved in producing the Products are treated humanely.

3.     For example, the packaging of the Products prominently states, under the heading "our promise," that the Products are a "one-of-a-kind milk" based on the goal of "making the world a better place." In bold font, Defendants promise: "Extraordinary care and comfort for our cows"; "Traceability back to our farms"; and "Continual pursuit of sustainable farming." Defendants also direct consumers to the Fairlife website—which makes additional claims about the humane treatment of animals—and invites consumers to "visit our flagship farm in Indiana so you can see for yourself!"

4.     Fairlife's entire marketing scheme focuses on the company's humane treatment of its dairy cows, and Fairlife specifically targets its advertising toward consumers who are willing to choose the Products and pay a premium to guarantee that the dairy products they purchase are from animals that are humanely treated.

5.     Defendants' representations are false. Contrary to Defendants' representations, the Products are not derived from cows that are treated "fairly" or with "extraordinary care and comfort"; to the contrary, Defendants' dairy cows are not

**CLASS ACTION COMPLAINT**

treated "fairly" at all—rather, they are the victims of horrendous animal abuse. The cruelty and suffering inflicted on the cows and calves at Fair Oaks Farms—the *flagship farm* for the Fairlife Products—was so significant that it has led to criminal charges being brought against three individuals.

6.     Plaintiff, and the many other consumers she seeks to represent, have been scammed by Defendants' false representations. Because consumers believed Defendants' claims about the humane treatment of animals at Fairlife farms— which were promised on the Products' labels— they were duped into buying Products that were sold not as advertised. Plaintiff and the Class members (defined below) suffered financial injury because they bought Products they otherwise would not have bought, or for which they would have paid less. But beyond that, they were forced, through Defendants' deception, to unknowingly contribute to and participate in the infliction of cruelty on the Fairlife cows through their purchases of the Products. To remedy this wrongdoing, Plaintiff brings this class action to put a stop to Defendants' deceptive and unlawful practices and to recover financial compensation for their injuries.

## PARTIES

7.     Plaintiff Marleny Olivo is a citizen of California, residing in Los Angeles, California. During the past year, Ms. Olivo purchased Defendants' Products from Food For Less in Los Angeles County. Prior to purchasing the Products, Ms. Olivo reviewed the Products' labels and relied on the following animal welfare claims on the Products' labels:

- "Our promise"
- "The idea for this one-of-a-kind milk began at our kitchen table over 20 years ago. It was an ambition to provide the world with better nutrition while making the world a better place. Our fairlife® family farmers provide high quality, real milk, filtered for wholesome nutrition with exceptional care taken every step of the way."

2

**CLASS ACTION COMPLAINT**

- "Extraordinary care and comfort for our cows"
- "We'd love to have you visit our flagship farm in Indiana so you can see for yourself!"
- The product name "Fairlife"
- The picture of the cow.

8.      Reasonably relying on these representations, Ms. Olivo believed she was buying Products from animals that are humanely treated and paid a premium for the Products. However, the Products were worth less than represented because the statements were not true and were highly misleading. Defendants' representations were part of the basis of the bargain in that Ms. Olivo attributed value to these promises and would not have purchased the Products, or would have paid significantly less for them, if she knew the truth about Defendants' abuse of their milk cows.

9.      While Ms. Olivo wishes to and is likely to purchase the Products in the future, should Ms. Olivo encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising and will therefore abstain from purchasing the Products. If Defendants take corrective action of their treatment of cows and correct the Products' labels, pricing, or treatment of its animals, Ms. Olivo would consider buying the current formulations of the Products in the future, as she is a regular milk purchaser.

10.     Defendant The Coca-Cola Company is a Delaware corporation with its principal place of business located in Atlanta, Georgia. The Coca-Cola Company markets and distributes the Products throughout the United States. In marketing the Products on its website, The Coca-Cola Company refers to the Products as one of its "brands."

11.     Defendant Fairlife, LLC, is a Delaware limited liability company with its principal place of business located in Chicago, Illinois. Fairlife, LLC, manufactures, markets, and sells the Products throughout the United States. Fairlife, LLC, is a joint

3

**CLASS ACTION COMPLAINT**

venture owned by The Coca-Cola Company ("Coca-Cola") and Select Milk Producers, Inc.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

13.     The Court has personal jurisdiction over Defendants, because they have sufficient minimum contacts with the State of California, and/or otherwise intentionally avails itself of the markets in the State of California through the promotion, marketing, and sale of Products in this State to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice because they markets, distributes, and sells the Products throughout the United States, including in this District.

14.     Venue is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and because Defendants are subject to personal jurisdiction in this District. 28 U.S.C. § 1391(b)(2)-(3).

## FACTUAL ALLEGATIONS

### Coca-Cola's Partnership with Fairlife

15.     In 2011, sales of major carbonated soft drinks were declining, affecting the bottom lines of companies like Coca-Cola.  Eager to increase sales of its product lines, in 2012, Coca-Cola formed a partnership with Select Milk Producers that would "rain[] money" for Coca-Cola.[1]

16.     Fairlife's former CEO Stephen Jones, who is also a former Coca-Cola executive, publicly acknowledged that Coca-Cola's sale of a premium milk product would help Coca-Cola's bottom line by also reversing declining milk consumption.

---

[1]   Coke Bets on "Premium Milk" to Boost Declining Category, *available at* https://www.agweb.com/article/coke-bets-on-premium-milk-to-boost-declining-category-naa-associated-press/ (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

Betting on a premium milk product, Coca-Cola hoped that Fairlife would be a significant driver of sales growth.

17.     Coca-Cola has, at all times relevant to this lawsuit, including to this day, maintained control over Fairlife—including regulating animal welfare, "ensur[ing] [that the dairy farmers] uphold the highest standards of animal welfare," and demanding that Fairlife conduct audits of dairy suppliers.[2]

18.     Coca-Cola's control over its suppliers includes enforceable Sustainable Agriculture Guiding Principles, and Supplier Guiding Principles, as well as an internal auditing process, all of which were in place throughout its relationship and ownership of Fairlife.

**Animal Welfare Claims Are Central to Defendants' Marketing**

19.     Defendants' Products are named "Fairlife." This prominent claim—namely the brand itself—means to reasonable consumers that the Fairlife dairy cows are treated "fairly." Further, Defendants devote an entire side of the packaging to telling the story about how humanely Fairlife dairy cows are treated and make nearly identical animal welfare claims on the labeling and packaging of all of the Products.

20.     The packaging invites consumers to "LEARN OUR STORY" at fairlife.com. Below that, Defendants make a lengthy promise to treat Fairlife dairy cows humanely.

21.     This representation is captioned with the heading "our promise," which is in bold font.

22.     Below the "our promise" heading, Defendants state that the Product is a "one-of-a-kind milk" arising out of "an ambition to provide the world with better nutrition while making the world a better place." It then states that Fairlife farmers take "exceptional care . . . every step of the way."

---

[2]  The Coca-Cola Company, *Taking Action to Address Animal Abuses at Fair Oaks Farms* (June 6, 2019),   https://www.coca-colacompany.com/press-center/company-statements/coca-cola-company-statement-regarding-fair-oaks-farms.

**CLASS ACTION COMPLAINT**

23.     Next is a bullet-point list, in bold font, which states:

- "Extraordinary care and comfort for our cows"
- "Exceptional quality milk standards"
- "Traceability back to our farms"
- "Continual pursuit of sustainable farming"

24.     Defendants then invite consumers to "visit our flagship farm in Indiana so you can see for yourself!" This refers to Fair Oaks Farms, where the Animal Recovery Mission ("ARM") uncovered pervasive practices of animal abuse.

25.     This side of the labeling is depicted below:

**CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21       26.    Defendants' message that animal welfare is paramount to Fairlife

22   operations is reinforced by the front of the labeling, which includes a stylized drawing

23   of a cow's face. The cute drawing—reminiscent of an illustration in a children's

24   book—encourages consumers to conclude that the animal is healthy and happy.

25       27.    Of course, the name "Fairlife" reinforces Defendants' animal welfare

26   message. Among the recognized meanings of the word "fair" are "marked by

27   impartiality and honesty"; "conforming with the established rules"; "not stormy or

28

**CLASS ACTION COMPLAINT**

foul"; "pleasing to the eye or mind"; and "clean, pure."[3] Particularly when coupled with a stylized drawing of an apparently happy, well-treated cow, the very name "Fairlife" suggests to reasonable consumers that Fairlife's animals are treated "fairly."

28.    The front of the labeling is depicted below:



29.    Defendants' animal welfare representations are also reinforced by the animal welfare claims on the Fairlife website. As noted above, the "our promise" side of the labeling invites consumers to "LEARN OUR STORY" at the Fairlife website, fairlife.com.

30.    The Fairlife website reinforces this animal welfare branding and messaging.

---

[3]    *Fair*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/fair (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

31.     Prior to the public revelations of animal abuse (discussed in more detail below), the Fairlife website contained a lengthy description of all the steps taken to make sure Fairlife dairy cows and calves were treated well.

32.     Prior to the public revelations of animal abuse in early June 2019, the Fairlife website featured an "OUR PROMISE" page that stated, in relevant part:

        a.   "We believe in doing better every step of the way, because it's the right thing to do. For us, 'better' means growing our own crops and putting our cows' well-being at the top of our list."

        b.   "As dairy farmers, we treat our cows with the utmost care, because we know that their health and happiness are the foundation of our business. We grow the crops that feed our cows so we can ensure that they're getting high quality nutrition. We invite you to our flagship farm in Fair Oaks, Indiana, to see just how we do it."[4]

33.     Prior to the public revelations of animal abuse in early June 2019, the Fairlife website featured an "Our Farms" page that stated, in relevant part:

        a.   "**BEST** *in* **CLASS ANIMAL CARE**: Co-founder Mike McCloskey got his start as a veterinarian specializing in dairy cows, so we know how important it is to put our cows' needs first. And since comfortable, healthy cows produce better quality milk, they reward us with some of the best milk in the industry."[5]

34.     Prior to the public revelations of animal abuse in early June 2019, the Fairlife website featured an "Animal Care" page that stated, in relevant part:

---

[4]  This is from the version of the Fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/ (last visited September 25, 2019).

[5] This is from the version of the Fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/our-farms/ (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

a. "**IT'S** *all* **ABOUT HER**: Our co-founder Mike McCloskey started his career as a cow veterinarian before turning to dairy farming, and under his care and guidance, we know that nothing is as important to us as the health and well-being of our animals. Our world revolves around making sure that our cows are fed well, treated humanely and live in comfortable, stress-free conditions."

b. "**SPOILED** *from the* **VERY START**: Newborn calves are visually monitored daily and are given immediate and proper medical treatment should they become ill."

c. "**COMFORTABLE** *at all* **TIMES**: She and her friends have comfortable beds and freestanding stalls, allowing them to walk freely while being protected from harsh weather. In the winter we keep wind and the elements out of their living areas by closing the curtained sidewalls of the barns. Cows love to stay cool, so in the warm summer months we use fans to maintain a 7 mph breeze over the feed manger and over the cows' beds. We also spray our cows' skin with water many times a day in order to keep their body temperature down."

d. "**ALWAYS** *in* **GOOD HANDS**: We spend a significant amount of time training all of our employees not only in proper animal husbandry but also indoctrinating them as to why we will accept nothing less than the utmost care, respect and humane treatment of our cows."[6]

35. In addition, prior to the public revelation of animal abuse, the website for Fair Oaks Farms linked to the farm's Facebook page, which explicitly stated that bull

---

[6] This is from the version of the Fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/animal-care/ (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

calves were not sent to be turned into veal. In a response posted on the Fair Oak Farms website, Mike McCloskey has now acknowledged that the representation regarding bull calves was untrue.[7]

36.     After the public revelation of widespread animal abuse at Fair Oaks Farms, Fairlife changed its website to remove some of the most blatant misrepresentations. Nevertheless, the Fairlife website still claims that animal welfare is an important part of its philosophy and operations. For example, the current Fairlife website states, in relevant part:

> a.    "**FAIRLIFE PROMISES AND ETHICAL PRACTICES**: We recognize that now more than ever we need more rigorous auditing and verification of our milk suppliers' practices when it comes to cow well-being."

> b.    "***cow care***: Our suppliers' cows' health and happiness are the foundation of the what we do. To better protect cows, we are increasing our investment in animal welfare actions, requiring training, certification and support programs for supplying farmers, so they can set the standard in the best practices in animal well-being. We are enhancing our farm monitoring policy, significantly increasing the number of animal welfare audits to 24 audits per year in cooperation with Select Milk Producers, all of which will be unannounced."[8]

37.     Prior to the discovery of animal abuse, the Coca-Cola website also corroborated that the welfare of Fairlife cows is one of the critical aspects of the Products. For example, one prominently displayed marketing article about the introduction of the Products to the Canadian market referred to "high-quality milk and

---

[7] *Official Statement From Our Founder Mike McCloskey On The ARM Video Release*, Fair Oaks Farms, https://fofarms.com/post/response/ (last visited September 25, 2019).

[8] *Our Promise*, Fairlife, https://fairlife.com/our-promise/ (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

animal care practices, which pair well with the premium standards and passion for quality fairlife is known for."[9]

38.     Another marketing article prominently displayed on the Coca-Cola website before the discovery of animal abuse, entitled *From Staple to Superfood: How fairlife's Belief in Better Milk is Shaking Up the Dairy Aisle*, repeatedly emphasized Defendants' animal welfare claims:

a.   "We've always known that the better you treat an animal, the happier and more productive she is. It's a symbiotic relationship."

b.   "The McCloskeys formed the co-op of fellow family-owned farms in 2004, gradually building a network of progressive farmers who share their 'grass to glass' commitment to milk quality, animal care and environmental sustainability. All fairlife products can be traced back to the dairies their milk comes from."

c.   "When we share our story of how we treat our cows and focus on their comfort and care and creating a stress-free environment, that really resonates with people who visit our farm . . . ."[10]

39.     A reasonable consumer would understand from each of the representations described above that Fairlife's dairy farms prioritize animal welfare and treat their cows with the utmost care and kindness. Moreover, the representations are mutually reinforcing, such that they work together to strengthen this message to consumers that Fairlife's cows are treated well.

---

[9] This is from the version of the Coca-Cola website that existed on July 12, 2018, according to the Wayback Machine, *available at* https://web.archive.org/web/20180612212301/https://www.coca-colacompany.com/stories/fairlife-ultrafiltered-milk-coming-to-canada (last visited September 25, 2019).

[10] This is from the version of the Coca-Cola website available on January 21, 2018, according to the Wayback Machine, *available at* https://web.archive.org/web/20180121142609/http://www.coca-colacompany.com/stories/from-staple-to-superfood-how-fairlifes-belief-in-better-milk-is-shaking-up-the-dairy-category (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

**Defendants' Animal Welfare Claims Are False**

40.     On June 4, 2019, and on September 25, 2019, ARM released the results of an undercover investigation it conducted of Fair Oaks Farms.[11] Fair Oaks Farms is the "flagship farm" for the Fairlife brand that Defendants invite consumers to visit and hold out to the public as the exemplar of their commitments to animal welfare and transparency.

41.     An undercover investigator working for ARM was hired as a calf-care employee at Fair Oaks Farms. In that role, the investigator bottle fed newborn calves, assisted loading calves on transports, and disposed of dead calves. The investigator used surveillance equipment to capture the normal daily practices on the farm.

42.     ARM also placed an investigator in the milking areas of Fair Oaks Farms, where day-to-day operations with cows took place.

43.     ARM's investigator found "extreme animal abuse" that was evidently "the normal way to do business at Fair Oaks Farms." Daily or commonplace practices included:

        a.     Separating calves from their mothers soon after birth (distressing both animals);

        b.     Throwing calves in and out of their huts;

        c.     Dragging calves by their ears (including from a motorized cart) or by their tails and legs;

        d.     Pushing, throwing, slapping, kicking, and slamming calves to the ground if the calves did not nurse from the artificial rubber nipple during the feeding process;

---

[11] The results of ARM's undercover investigation are available at https://animalrecoverymission.org/wp-content/uploads/2019/06/Operation_Fair_Oaks_Farms_Dairy_Adventure.pdf (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

e.  Dumping formula on the ground instead of feeding it to calves, thereby denying them the appropriate nutrition and hydration needed to survive;

f.  Ignoring the numerous emaciated cows, which had a body score of two or three on the nine-point scale;

g.  Maintaining calves in filthy conditions;

h.  Joking with other employees while sitting on top of a calf, whose legs buckled because they could not support the extra weight;

i.  Stabbing and hitting calves with objects including steel rebars, hard plastic milking bottles, steel branding irons;

j.  Burning calves' faces and bodies with hot branding irons;

k.  Breaking tails of cows who would not move in the milking parlor;

l.  Kicking, beating, punching, pushing, and otherwise abusing cows;

m.  Pinning cows inside milking-carousel machinery and allowing them to fall out of it;

n.  Dragging downed cows with straps who were too sick or weak to walk;

o.  Packing cows into overcrowded housing; and

p.  Denying medical care to sick cows, including downers that were left to die slowly.

44.  None of the problematic footage found by the ARM investigation took place in areas open to the public.

45.  The ARM investigation is also notable for what it did *not* find. The investigator never observed disciplinary action being taken against any employee, even though the animal abuse was known and perpetuated at all levels of employment, including foremen and upper management. Law enforcement was never contacted or notified.

14

**CLASS ACTION COMPLAINT**

46.     The investigator found no medical attention paid to calves or cows, even though the Fairlife website claimed the contrary. Medical attention was not provided even when temperatures in the calves' hutches reached 110 degrees Fahrenheit.

47.     Adult cows that became sick or injured also did not receive treatment. When adult cows were too sick to produce milk, they were shot or left to languish and die slowly. When the animals were shot, small-caliber bullets were improperly used by untrained workers. As a result, the cows frequently suffered for hours before they died.

48.     ARM's investigator received training related to the transportation of dead calves. Employees were instructed to "always take the back dairy roads while transporting the dead to a hidden dump area" to prevent any tourists or tour buses from seeing the workers disposing of the dead animals.

49.     Male calves were sold to veal farms—contrary to Fair Oaks Farms' promise that this would not be done—where they were held in such small enclosures that they were unable to turn around and were forced constantly to stand in their own feces.

50.     As a result of the ARM investigation, the Newton County Sheriff's Office (Indiana) launched an investigation of its own. Newtown County prosecutors have filed criminal charges against three individuals for animal cruelty (a Class A misdemeanor) and torturing or mutilating a vertebrate animal (a Class 6 felony). Prosecutors have issued arrest warrants and arrested at least one individual. The investigation is still active and ongoing.

51.     On June 6, 2019, Fairlife, LLC, issued a statement acknowledging the ARM investigation, admitting the truth of its allegations, and apologizing for its failures. Fairlife, LLC, stated that it was "devastated by the abuse that was recently discovered at Fair Oaks Farms." It also indicated it was discontinuing the use of milk from Fair Oaks Farms, increasing animal welfare requirements, and seeking further

**CLASS ACTION COMPLAINT**

audits by industry representatives.[12] The current Coca-Cola website also references these events and refers to the Fairlife website.[13]

52.     Coca-Cola, for its part, stated that, in addition to "conducting [its] own independent investigations of all fairlife's dairy suppliers to ensure they uphold the highest standards of animal welfare," it was "taking action to ensure that internationally recognized animal welfare standards are appropriately enforced through our Sustainable Agriculture Guiding Principles, our Supplier Guiding Principles and our auditing processes."[14]

**Animal Welfare Is Material to Consumers**

53.     Meat and dairy companies increasingly make animal welfare claims about their products because they have discovered those claims increase sales, allow them to charge higher prices, or both. Animal welfare claims are profitable because consumers care about the treatment of the animals that their food comes from. Consumers are more likely to buy a product, and will pay more for it, if the animals it is comes from were treated humanely.

54.     Numerous studies conducted by third parties have confirmed the fact that animal welfare matters to consumers.

55.     In one survey published in 2010, 68% of consumers agreed or strongly agreed they would like to know more about "ways [farmers] ensure animal care."[15] That was the second-highest rate of agreement with any survey question, behind only "measures used to produce safe food."

---

[12] *Fairlife Statement on Animal Care*, Fairlife, https://fairlife.com/news/fairlife-statement-regarding-arm-video/ (last visited September 25, 2019).

[13] *fairlife*, The Coca-Cola Company, https://www.coca-colacompany.com/brands/fairlife (last visited September 25, 2019).

[14] *Taking Action to Address Animal Abuses at Fair Oaks Farms*, The Coca-Cola Company, https://www.coca-colacompany.com/press-center/company-statements/coca-cola-company-statement-regarding-fair-oaks-farms (last visited September 25, 2019).

[15] *What "Indicator Consumers" Want to Know Most About How U.S. Foods Are Produced*, SEGMENTrak (June 2010), *available at* http://demetercommunications.com/wp-content/uploads/2011/05/FINAL.Demeter.SegemenTrak.Full_Report.June2010.pdf.

**CLASS ACTION COMPLAINT**

56.     Another 2010 study found "that consumers desire high standards of animal care, even if it raises food prices and involves government regulation."[16]

57.     A study published by the Animal Humane Association in 2014, indicated that concerns may be increasing among consumers. For instance, it found that 94.9% of survey participants "stated they were very concerned about farm animal welfare," up from 89% the year before. Similarly, "75.7% stated that they were very willing to pay more for humanely raised meat, dairy and eggs," which was an increase from 74% the year before. Additionally, the most important labeling attribute to consumers was "humanely raised," including over labels such as "antibiotic free," "natural," and "organic."[17]

58.     Wal-Mart announced in 2015 that its own research shows that 77% of its shoppers would increase their trust of, and 66% would increase their likelihood to shop at, a retailer that improved the treatment of livestock.[18]

59.     One 2018 survey found that 77% of consumers were concerned about animal welfare as it relates to their food, more than 66% of consumers paid some or a lot of attention to food labels regarding how the animal was raised, and over 70% of retailers stocking products with humane claims reported increased sales.[19]

60.     Fairlife, LLC itself has acknowledged the importance of animal welfare to its consumers. In an interview conducted after public revelation of animal abuse at

[16] RW Prickett et al., *Consumer Preferences for Farm Animal Welfare: Results from a Telephone Survey of US Households*, Animal Welfare (Aug. 2010), *available at* https://www.ingentaconnect.com/contentone/ufaw/aw/2010/00000019/00000003/art00015 (last visited September 25, 2019).

[17] *2014 Humane Heartland Farm Animal Welfare Survey*, *available at* https://www.americanhumane.org/app/uploads/2016/08/2014-humane-heartland-farm-survey.pdf (last visited September 25, 2019).

[18] Christine M. Boynton, *Wal-Mart's Push on Animal Welfare Hailed as Game Changer*, Fox 5 News, https://foxbaltimore.com/news/local/wal-mart39s-push-on-animal-welfare-hailed-as-game-changer (last visited September 25, 2019).

[19] Alicia Kelso, *Consumers Are Willing to Pay a Premium for Animal Welfare Certifications*, Grocery Dive (July 17, 2018), https://www.grocerydive.com/news/grocery--consumers-are-willing-to-pay-a-premium-for-animal-welfare-certifications/533852/ (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

Fair Oaks Farms, Fairlife COO Tim de Doleman stated that "this whole company . . . [is] built on great animal welfare."[20]

61.    Accordingly, Fairlife's marketing of its Products as humanely treating the animals used to produce the Products is material to the reasonable consumer. Reasonable consumers would not expect that Products labeled with the promises by Fairlife discussed herein would be produced through the inhumane treatment of animals as described above.

62.    The marketplace's reaction to the public revelation of animal abuse at Fair Oaks Farms further demonstrates the importance to consumers of humane animal treatment. Numerous retailers have stopped selling the Products as a result of the animal abuse.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), on behalf of herself and on behalf of following Class and Subclasses which, unless otherwise specified, are referred to collectively as the "Class":

a.    All persons who purchased the Products within the U.S. within the applicable statute of limitations period ("Nationwide Class");

b.    All persons who purchased the Products within the State of California within the applicable statute of limitations period ("California Subclass"); and

c.    All persons who purchased the Products within the State of California for personal, family, or household purposes within the applicable statute of limitations period ("California Consumer Subclass").

---

[20] *Fairlife COO Speaks Out After Release of Undercover Videos*, NBC Chicago (June 7, 2019), https://www.nbcchicago.com/multimedia/web-fairlife-coo-interview_Chicago-510995412.html (last visited September 25, 2019).

**CLASS ACTION COMPLAINT**

64.   Excluded from the Class are Defendants, including their parents, subsidiaries, affiliates, officers, and directors; those who purchased the Products for resale; all persons who make a timely election to be excluded from the Class; and the judicial officers and staff to whom this case is assigned and any immediate family members thereof.

65.   **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendants have sold many thousands of units of the Products to Class members.

66.   **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether the representations discussed herein that Defendants made about the Products were or are true, misleading, or likely to deceive a reasonable consumer;

    b.    Whether the representations discussed herein were material to a reasonable consumer;

    c.    Whether Defendants' conduct violates public policy;

    d.    Whether Defendants engaged in false or misleading advertising;

    e.    Whether Defendants' conduct constitutes violations of the laws asserted herein;

    f.    Whether Plaintiff and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

    g.    Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

19

**CLASS ACTION COMPLAINT**

67. **Typicality:** Plaintiff's claims are typical of those of the other Class members because, among other things, Plaintiff and all Class members were comparably injured through the uniform conduct described herein.

68. **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiff and her counsel.

69. **Declaratory and Injunctive Relief:** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

70. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**CLASS ACTION COMPLAINT**

**CAUSES OF ACTIONS**

**FIRST CLAIM FOR RELIEF**
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq*.**
(***for the California Consumer Subclass***)
(***for injunctive relief only***)

71.  Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

72.  Plaintiff brings this claim individually and on behalf of the members of the proposed California Consumer Subclass against Defendants.

73.  The Products are "goods" within the meaning of Cal. Civ. Code § 1761(a), and the purchases of such Products by Plaintiff and members of the California Consumer Subclass constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

74.  Cal. Civ. Code § 1770(a)(2) prohibits "misrepresenting the source, sponsorship, approval, or certification of goods or services." By marketing the Products with the animal welfare claims, Defendants have represented and continue to represent that the Products are derived from humanely raised cows when they are not. Therefore, Defendants have violated section 1770(a)(2) of the CLRA.

75.  Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . ." By marketing the Products with the animal welfare claims, Defendants have represented and continue to represent that the Products have characteristics (are derived from humanely raised cows) that they do not have. Therefore, Defendants have violated section 1770(a)(5) of the CLRA.

76.  Cal. Civ. Code § 1770(a)(7) prohibits "[r]espresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By marketing the Products with the animal

**CLASS ACTION COMPLAINT**

welfare claims, Defendants have represented and continue to represent that the Products are of a particular standard or quality (from humanely raised cows) when they are of another. Therefore, Defendants have violated section 1770(a)(7) of the CLRA.

77. Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By marketing the Products with the animal welfare claims, and then not selling the Products with milk from humanely treated cows, Defendants have violated section 1770(a)(9) of the CLRA.

78. Defendants have also violated the CLRA by intentionally failing to disclose material information about the Products, such as the fact that the milk is derived from cows that are systematically abused and mistreated.

79. At all relevant times, Defendants have known or reasonably should have known that the milk in the Products is derived from cows that are systematically abused and mistreated, and that Plaintiff and other members of the California Consumer Subclass would reasonably and justifiably rely on the packaging and other advertisements in purchasing the Products.

80. Plaintiff and other members of the California Consumer Subclass have reasonably and justifiably relied on Defendants' misleading and fraudulent conduct when purchasing the Products. Moreover, based on the materiality of Defendants' fraudulent and misleading conduct, reliance may be presumed or inferred for Plaintiff and other members of the California Consumer Subclass.

81. Plaintiff and other members of the California Consumer Subclass have suffered and continue to suffer injuries caused by Defendants because they would not have purchased the Products or would have paid significantly less for the Products had they known that Defendants' conduct was misleading and fraudulent.

82. Under Cal. Civ. Code § 1780(a), Plaintiff and other members of the California Consumer Subclass are seeking injunctive relief pursuant to the CLRA,

preventing Defendants from further wrongful acts and unfair and unlawful business practices.

## SECOND CLAIM FOR RELIEF
### Violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*
### (*for the California Subclass and California Consumer Subclass*)

83.    Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

84.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass and California Consumer Subclass against Defendants.

85.    Cal. Bus. & Prof Code § 17200 provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

86.    Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law.

87.    Defendants' misleading advertising of the Products therefore was and continues to be "unlawful" because it violates the CLRA, California's False Advertising Law ("FAL"), and other applicable laws as described herein.

88.    As a result of Defendants' unlawful business acts and practices, Defendants have unlawfully obtained money from Plaintiff and members of the California Subclass and California Consumer Subclass.

89.    Under the UCL, a business act or practice is "unfair" if the defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

90.    Defendants' conduct was and continues to be of no benefit to purchasers of the Products, as it is misleading, unfair, unlawful, and is injurious to consumers who

**CLASS ACTION COMPLAINT**

rely on the Products' packaging and marketing. Creating consumer confusion as to the welfare of the animals used to derive the Products is of no benefit to consumers. Therefore, Defendants' conduct was and continues to be "unfair."

91.    As a result of Defendants' unfair business acts and practices, Defendants have and continue to unfairly obtain money from Plaintiff, and members of the California Subclass and California Consumer Subclass.

92.    Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public.

93.    Defendants' conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Products contain milk from humanely treated cows when they do not. Defendants' conduct is also fraudulent because Defendants fail to disclose material information about the Products, such as the fact that the milk is derived from cows that are systematically abused and mistreated.

94.    Because Defendants misled Plaintiff and members of the California Subclass and California Consumer Subclass, Defendants' conduct was "fraudulent."

95.    As a result of Defendants' fraudulent business acts and practices, Defendants have and continue to fraudulently obtain money from Plaintiff and members of the California Subclass and California Consumer Subclass.

96.    Plaintiff requests that this Court cause Defendants to restore this unlawfully, unfairly, and fraudulently obtained money to Plaintiff, and members of the California Subclass and California Consumer Subclass, to disgorge the profits Defendants made on these transactions, and to enjoin Defendants from violating the UCL or violating it in the same fashion in the future as discussed herein. Otherwise, Plaintiff, and members of the California Subclass and California Consumer Subclass, may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**CLASS ACTION COMPLAINT**

**THIRD CLAIM FOR RELIEF**
**Violation of California's False Advertising Law ("FAL"),**
**California Business & Professions Code §§ 17500, *et seq.***
***(for the California Subclass and California Consumer Subclass)***

97.     Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

98.     Plaintiff brings this claim individually and on behalf of the members of the proposed the California Subclass and California Consumer Subclass against Defendants.

99.     California's FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

100.   Defendants have represented and continues to represent to the public, including Plaintiff and members of the California Subclass and California Consumer Subclass, through Defendants' deceptive packaging and marketing, that the Products are made with milk from humanely raised cows. Defendants' representations are false and misleading because the Products do not contain milk from humanely raised cows. Because Defendants have disseminated false and misleading information regarding the Products, and Defendants know, knew, or should have known through the exercise of reasonable care that the representations are and continue to be false and misleading, Defendants have violated the FAL.

101.   Defendants' conduct is also misleading because Defendants fail to disclose material information about the Products, such as the fact that the milk is derived from cows that are systematically abused and mistreated.

102.   As a result of Defendants' false advertising, Defendants have and continue to fraudulently obtain money from Plaintiff and members of the California Subclass and California Consumer Subclass.

103.   Plaintiff requests that this Court cause Defendants to restore this fraudulently obtained money to Plaintiff and members of the California Subclass and California Consumer Subclass, to disgorge the profits Defendants made on these transactions, and to enjoin Defendants from violating the FAL or violating it in the same fashion in the future as discussed herein.  Otherwise, Plaintiff and members of the California Subclass and California Consumer Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### FOURTH CLAIM FOR RELIEF
### Breach of Express Warranty
### California Commercial Code § 2313
***(for the California Subclass and California Consumer Subclass)***

104.   Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

105.   Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass and California Consumer Subclass against Defendants.

106.   California Commercial Code § 2313 provides that "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."  Cal. Com. Code § 2313.

**CLASS ACTION COMPLAINT**

107.   Defendants have expressly warranted and continue to expressly warrant on the Products' packaging that the Products are made with milk from humanely raised cows. These representations about the Products: (1) are affirmations of fact or promises made by Defendants to consumers that the Products are made with milk from humanely raised cows; (2) became part of the basis of the bargain to purchase the Products when Plaintiff relied on the representations; and (3) created an express warranty that the Products would conform to these affirmations of fact or promises. In the alternative, the representations about the Products are descriptions of goods which were made as part of the basis of the bargain to purchase the Products, and which created an express warranty that the Products would conform to the product descriptions.

108.   Plaintiff and members of both the California Subclass and California Consumer Subclass reasonably and justifiably relied on the foregoing express warranties, believing that the Products did in fact conform to these warranties.

109.   Defendants have breached the express warranties made to Plaintiff and members of both the California Subclass and California Consumer Subclass by failing to manufacture the Products with milk from humanely raised cows.

110.   Plaintiff and members of both the California Subclass and California Consumer Subclass paid a premium price for the Products but did not obtain the full value of the milk as represented. If Plaintiff and members of both the California Subclass and California Consumer Subclass had known of the true nature of the Products, they would not have purchased the Products or would not have been willing to pay the premium price associated with the Products.

111.   As a result, Plaintiff and members of both the California Subclass and California Consumer Subclass suffered injury and deserve to recover all damages afforded under the law.

**CLASS ACTION COMPLAINT**

112.   Within a reasonable amount of time after Plaintiff discovered that Defendants did in fact breach the express warranty, Plaintiff notified Defendants of the breach.

## FIFTH CLAIM FOR RELIEF
### Breach of Implied Warranty
### California Commercial Code § 2314
### *(for the California Subclass and California Consumer Subclass)*

113.   Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

114.   Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass and California Consumer Subclass against Defendants.

115.   California Commercial Code § 2314(1) provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Cal. Com. Code § 2314(1).

116.   California Commercial Code § 2314(2) provides that "[g]oods to be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or label if any."  Cal. Com. Code § 2314(2)(f).

117.   Defendants are merchants with respect to the sale of milk, including the Products here. Therefore, a warranty of merchantability is implied in every contract for sale of the Products to California consumers.

118.   By advertising the Products with their current packaging, Defendants made an implied promise that the Products were made with milk from humanely raised cows. By not making the Products with milk from humanely raised cows, Defendants have not "conformed to the promises . . . made on the container or label." Plaintiff, the California Subclass and the California Consumer Subclass did not receive the goods as impliedly warranted by Defendants to be merchantable.

**CLASS ACTION COMPLAINT**

119.   Therefore, the Products are not merchantable under California law and Defendants have breached their implied warranty of merchantability in regard to the Products.

120.   If Plaintiff and members of both the California Subclass and California Consumer Subclass had known that the Products were not made with milk from humanely raised cows, they would not have purchased them or would not have been willing to pay the premium price associated with the milk. Therefore, as a direct and/or indirect result of Defendants' breach, Plaintiff and members of both the California Subclass and California Consumer Subclass have suffered injury and deserve to recover all damages afforded under the law.

## SIXTH CLAIM FOR RELIEF
### Common Law Fraud
### (for the Classes)

121.   Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

122.   Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendants.

123.   Defendants have willfully, falsely, or knowingly packaged and marketed the Products in a manner indicating that the Products are made with milk from humanely raised cows. However, the Products are not made with milk from humanely raised cows. Therefore, Defendants have made misrepresentations as to the Products.

124.   Defendants also failed to disclose that the Products are made with milk from cows that are systematically abused and mistreated, in order to induce consumers' purchases of the Products.

125.   Defendants' misrepresentations and omissions are and were material (i.e., the type of misrepresentations to which a reasonable person would attach importance and would be induced to act thereon in making purchase decisions) because they relate to the characteristics of the Products and how they were made.

126.   Defendants knew or recklessly disregarded the fact that the Products are made with milk from cows that are systematically abused and mistreated.

127.   Defendants intend that Plaintiff and other consumers rely on these representations and omissions, as evidenced by Defendants intentionally using labeling that either directly states or clearly implies that the Products are made with milk from cows that are humanely raised.

128.   Plaintiff and members of the Classes have reasonably and justifiably relied on Defendants' misrepresentations and omissions when purchasing the Products and, had the correct facts been known, would not have purchased the Products or would not have purchased them at the prices at which they were offered.

129.   Therefore, as a direct and proximate result of Defendants' fraud, Plaintiff and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the amounts paid for the Products, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### Negligent Misrepresentation
#### (*for the Classes*)

130.   Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

131.   Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendants.

132.   Defendants marketed the Products in a manner indicating that the milk is from cows that are humanely raised. However, the cows are systematically abused and mistreated. Therefore, Defendants have made misrepresentations as to the Products.

133.   Defendants' misrepresentations regarding the Products are material to a reasonable consumer because they relate to the characteristics of the milk. A reasonable

**CLASS ACTION COMPLAINT**

consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

134. At all relevant times when such misrepresentations were made, Defendants knew or had been negligent in not knowing that that the Products were not made with from milk from cows that are humanely raised. Defendants had no reasonable grounds for believing their misrepresentations were not false and misleading.

135. Defendants intend that Plaintiff and other consumers rely on these representations, as evidenced by Defendants intentionally using packaging that either directly states or clearly implies that the milk is from cows that are humanely raised.

136. Plaintiff and members of the Classes have reasonably and justifiably relied on Defendants' negligent misrepresentations when purchasing the Products and, had the correct facts been known, would not have purchased the Products or would not have purchased them at the prices at which they were offered.

137. Therefore, as a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the amounts paid for the Products and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
### (*for the Classes*)

138. Plaintiff repeats the allegations contained in paragraphs 1-70 above as if fully set forth herein.

139. Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendants.

31

**CLASS ACTION COMPLAINT**

140.   As alleged herein, Defendants have intentionally and recklessly made misleading representations to Plaintiff and members of the Classes to induce them to purchase the Products. Plaintiff and members of the Classes have reasonably relied on the misleading representations and have not received all of the benefits promised by Defendants. Plaintiff and members of the Classes therefore have been induced by Defendants' misleading and false representations about the Products and paid for them when they would and/or should not have or paid more money to Defendants for the Products than they otherwise would and/or should have paid.

141.   Plaintiff and members of the Classes have conferred a benefit upon Defendants as Defendants have retained monies paid to them by Plaintiff and members of the Classes.

142.   The monies received were obtained under circumstances that were at the expense of Plaintiff and members of the Classes – i.e., Plaintiff and members of the Classes did not receive the full value of the benefit conferred upon Defendants.

143.   Therefore, it is inequitable and unjust for Defendants to retain the profit, benefit, or compensation conferred upon them without paying Plaintiff and the members of the Classes back for the difference of the full value of the benefits compared to the value actually received.

144.   As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and members of the Classes are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants from their deceptive, misleading, and unlawful conduct as alleged herein.

## **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment against Defendants as follows:

**CLASS ACTION COMPLAINT**

1.    Certifying the Class as requested herein, designating Plaintiff as class representative and appointing the undersigned counsel as class counsel;

2.    Declaring that Defendants are financially responsible for notifying the Class members of the pendency of this suit;

3.    Damages to the maximum extent allowed, in an amount to be proven at trial;

4.    Restitution and disgorgement of all profits and unjust enrichment Defendants obtained from Plaintiff and Class members as a result of Defendants' unlawful, unfair and fraudulent business practices;

5.    Injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

6.    Payment of Plaintiff's reasonable attorneys' fees, costs, and expenses;

7.    Pre- and post-judgment interest on any amounts awarded; and

8.    Such other and further relief as may be just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 25, 2019        **FARUQI & FARUQI, LLP**

By: */s/ Benjamin Heikali*
Benjamin Heikali, Bar No. 307466
10866 Wilshire Blvd., Suite 1470
Los Angeles, CA 90024
Telephone: 424.256.2884
Fax: 424.256.2885
E-mail: bheikali@faruqilaw.com

33

**CLASS ACTION COMPLAINT**